UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SEAN MCCONVILLE, *et al.*,                    Case No. 23-11749

        Plaintiffs,                          F. Kay Behm
v.                                           United States District Judge

GOODLEAP, LLC, *et al.*,

        Defendants.
_____ /

**OPINION AND ORDER GRANTING GOODLEAP'S MOTION TO DISMISS AND COMPEL ARBITRATION (ECF No. 6), DENYING PLAINTIFFS' MOTION FOR LIMITED DISCOVERY (ECF No. 17), GRANTING WALLER'S MOTION TO DISMISS (ECF No. 11), and GRANTING TRIVEST'S MOTION TO DISMISS (ECF No. 21)**

## I.    PROCEDURAL HISTORY

Plaintiffs filed this lawsuit in the Northern District of Ohio and it was

transferred to the Eastern District of Michigan as a companion case to *Hall v.*

*Trivest*, EDMI Case No. 22-01238.  (ECF No. 3).  Plaintiffs entered into a written

sale agreement with Power Home Solar, LLC d/b/a Pink Energy ("PHS") for the

purchase and installation of a residential solar system.  Defendant Jayson Waller

is the former Chief Executive Officer of PHS.  The sale agreement was executed

contemporaneously with a written financing agreement between Plaintiffs and

Defendant GoodLeap LLC.  Defendant Trivest Partners LLC held a 25% stake in

PHS.  Plaintiffs bring breach of contract, fraud, negligence, breach of warranty,

civil conspiracy, consumer protection act, and declaratory judgment claims against Defendants. (ECF No. 2).

Defendant GoodLeap filed a motion to dismiss the amended complaint and compel arbitration. (ECF No. 6). Plaintiffs filed a motion to compel limited discovery on whether the arbitration provision in the agreement between GoodLeap and Plaintiffs is enforceable. (ECF No. 17). Defendant Waller filed a motion to dismiss the amended complaint based on a failure to state a claim. (ECF No. 11). Defendant Trivest filed a motion to dismiss based on lack of personal jurisdiction and failure to state a claim. (ECF No. 21). These matters are fully briefed and the court held a hearing on all four motions on March 18, 2024. (ECF No. 38).

For the reasons set forth below, GoodLeap's motion to dismiss and compel arbitration is **GRANTED**, Plaintiffs' motion for limited discovery is **DENIED**, Waller's motion to dismiss is **GRANTED**, with prejudice, and Trivest's motion to dismiss is **GRANTED**, without prejudice.

## II. GOODLEAP'S MOTION TO COMPEL ARBITRATION AND PLAINTIFFS' MOTION FOR DISCOVERY

### A. Factual Background

Both Plaintiffs admit that they "electronically signed the Loan Agreement." (ECF No. 2, ¶ 61). However, Plaintiffs only attached to the FAC the Loan

Agreement signed by Sean McConville.  (ECF No. 2-2).  Sean electronically

executed the Loan using DocuSign on September 15, 2020.  (*Id.*; ECF Nos. 6-3, 6-

4).  The Agreement requires Sean to make monthly payments of $219.52, which

increase to $298.65 after 18 months if he does not make any voluntary payments

during that introductory period.  (ECF No. 6-4, at 2-4).  The first payment was due

approximately 60 days after GoodLeap funded the Loan, regardless of whether

Sean had received permission from his utility to operate the System.  *Id*. at 2-3.

Sean initialed each of the paragraphs in the Loan Agreement that contain these

provisions, indicating his assent.  *Id*. at 2-4.

On February 1, 2021, GoodLeap emailed a welcome letter to Sean, care of

Sara at sara.mcconville@outlook.com.  (ECF No. 6-5) ("Welcome Letter").  The

Welcome Letter thanked Sean for choosing GoodLeap, attached a closing

certificate that outlined the terms of the Loan, and included a final Truth in

Lending Act disclosure.  (ECF No. 6-1, Mellott Aff. ¶¶ 25-2; ECF No. 6-5).  After

executing the Loan, Plaintiffs made payments to GoodLeap totaling $16,823.64.

(ECF No. 6-1, Mellott Aff. ¶ 39; ECF No. 6-6).

The Loan Agreement contains an arbitration provision that requires the

Parties submit "[a]ll claims and disputes arising out of or relating to th[e]

Agreement to binding arbitration."  (ECF No. 6-4, ¶ 15).  Paragraph 15 of the

Agreement (the "Arbitration Provision") more fully states:

> **All claims and disputes arising out of or relating to this Agreement (hereafter, "Dispute(s)") shall be resolved by binding arbitration on an individual basis. The arbitrator shall also decide any issues relating to the making, validity, enforcement, or scope of this arbitration agreement, arbitrability, defenses to arbitration including unconscionability, or the validity of the jury trial, class action or representative action waivers (collectively, "arbitrability" issues). YOU HEREBY WAIVE ANY CONSTITUTIONAL AND STATUTORY RIGHTS TO GO TO COURT AND HAVE A TRIAL IN FRONT OF A JURY. FURTHER, UNLESS YOU OPT OUT OF ARBITRATION, YOU ALSO AGREE TO WAIVE ANY RIGHT TO BRING OR PARTICIPATE IN A CLASS OR REPRESENTATIVE ACTION IN COURT OR IN ARBITRATION…**
>
> **The Federal Arbitration Act (9 U.S.C. §§ 1-16) (the "FAA") shall govern this agreement to arbitrate including all arbitrability issues. No state law respecting arbitrability issues shall govern this agreement to arbitrate. Subject to and without limiting the foregoing, federal law shall apply to all other issues that arise under federal law and applicable state law as set forth in Section 14 above shall apply to all other issues that arise under state law (without reference to a state's choice of law rules).**

(ECF No. 6-4, ¶ 15) (emphasis in original).  The arbitration provision also explains

the procedure for filing arbitration:

> **The arbitration shall be administered by JAMS pursuant to its Streamlined Arbitration Rules (the "Rules"). A**

> **copy of the JAMS Streamlined Arbitration Rules can be obtained from JAMS at https://www.jamsadr.com/rules-streamlined-arbitration or (800) 352-5267. The arbitrator shall be selected from the JAMS panel of neutrals and shall be a retired federal judge, a retired state appellate judge, or a retired state trial judge (in that order of preference).**

*Id*. (emphasis in original).  The arbitration provision further explains that:

> **The arbitrator shall have the authority to award any relief, including injunctive relief, which is available under applicable law. Each party shall bear the expense of its own counsel, experts, witnesses and preparation and presentation of proofs. However, the arbitrator may award you reasonable attorney's fees and costs if this is expressly authorized by applicable law. Upon request, we will pay a portion of the fees and expenses of the arbitrator and the administrative fees and expenses of the arbitration. The arbitrator shall issue a written award describing the essential findings supporting the award. All hearings in the arbitration shall take place within the federal judicial district where the Residence is located; the arbitrator's award shall be final and judgment on the arbitrator's award may be entered by the federal District Court.**

*Id*. (emphasis in original).

The Loan Agreement provided Sean 15 days from the date of execution to opt out of the Arbitration Provision; however, he did not exercise this option.  *Id*.; ECF No. 6-1, Mellott Aff. ¶ 24.  The Loan Agreement also contains the following acknowledgement in all capital letters directly above the space for him to enter his initials:

> **BY PLACING YOUR INITIALS BELOW THIS NOTICE YOU
> CERTIFY THAT YOU HAVE READ AND AGREE TO
> SECTION 15 IN ITS ENTIRETY**.

(ECF No. 6-4, ¶ 15) (emphasis in original).  According to GoodLeap, Sean entered

his initials below this notice, demonstrating his assent to the arbitration provision.

*Id*.  GoodLeap argues, therefore, that Plaintiffs were fully aware of the binding

nature of the Arbitration Provision, and that it precluded them from filing suit in

court and from demanding a jury trial.  *Id*.  Finally, paragraph 14 of the Loan

Agreement states:

> Except for the [Arbitration Provision], this Agreement
> shall be governed by federal law and, to the extent state
> law applies, the substantive laws of the state where the
> Residence is located.

(ECF No. 6-4, ¶ 14).

    B.   <u>Legal Standards under FAA</u>

As an initial matter, Plaintiffs argue that Ohio law applies and thus, the

court should look to the Ohio Arbitration Act in conjunction with the FAA to

assess whether the arbitration clause is enforceable.  However, the parties'

agreement plainly provides that the "Federal Arbitration Act … shall govern this

agreement to arbitrate including all arbitrability issues.  No state law respecting

arbitrability issues shall govern this agreement to arbitrate."  (ECF No. 6-4, ¶ 15).

Accordingly, the choice-of-law provision in the agreement provides that the FAA

governs all questions regarding the validity and scope of the arbitration provision. *See Uhl v. Komatsu Forklift Co., Ltd*., 512 F.3d 294, 303 (6th Cir. 2008) (concluding that, where the parties' choice of law provision referenced both the FAA and Michigan law, the FAA governed).

The Federal Arbitration Act provides that a written agreement to arbitrate disputes arising out of a contract involving interstate commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  A party seeking to enforce an arbitration agreement may request that litigation be stayed until the terms of the arbitration agreement have been fulfilled.  *Id*. § 3.  On such application, "[t]he court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement."  *Id*. § 4.

With respect to the arbitration agreement's validity, "the party opposing arbitration must show a genuine issue of material fact as to the validity of the agreement to arbitrate."  *Great Earth Companies, Inc. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002) (internal quotation marks and citations omitted).  With respect to the agreement's scope, "there is a presumption of arbitrability in the sense

that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT&T Techs., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 650 (1986) (internal citations and quotation marks omitted).  In other words, keeping in mind the "strong federal policy in favor of arbitration ... any ambiguities in the contract or doubts as to the parties' intentions should be resolved in favor of arbitration," *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000), especially when the arbitration clause is written broadly to encompass all claims arising under the contract, *AT&T Techs.*, 475 U.S. at 650.

Federal courts apply state law to determine whether contract defenses may invalidate arbitration agreements.  *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687 (1996).  Federal law governs questions pertaining to the interpretation and construction of arbitration agreements.  *Moses A. Cone*, 460 U.S. at 25.  The burden is on the party opposing arbitration to show that the agreement is not enforceable.  *Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79 (2000). In determining whether the parties have agreed to arbitrate a particular dispute, federal courts apply state-law principles of contract formation.  *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

C.    Analysis

Here, GoodLeap argues that that the arbitration clause in the parties'
agreement is enforceable and that the arbitrability question, along with Plaintiffs'
unconscionability challenges, have been delegated to the arbitrator.  Plaintiffs, on
the other hand, argue that that the arbitration provision was borne of fraud and is
unconscionable, and thus should be voided.

Generally, before compelling arbitration, the court "must engage in a
limited review to determine whether the dispute is arbitrable."  *Masco Corp. v.
Zurich Am. Ins. Co.*, 382 F.3d 624, 627 (6th Cir. 2004) (quoting *Javitch v. First
Union Sec., Inc.*, 315 F.3d 619, 624 (6th Cir. 2003)); *see also Swiger v. Rosette*, 989
F.3d 501, 505 (6th Cir. 2021) ("Generally, when asked to compel arbitration under
a contract, a court determines whether the parties agreed to arbitrate their
dispute.").  Such review requires the court to determine (1) whether "a valid
agreement to arbitrate exists between the parties," and (2) whether "the specific
dispute falls within the substantive scope of the agreement."  *Id*. (quoting *Javitch*,
315 F.3d at 624).  "The FAA, however, allows parties to agree that an arbitrator,
rather than a court, will determine "'gateway' questions of 'arbitrability,' such as
whether the parties have agreed to arbitrate or whether their agreement covers a
particular controversy.'"  *Id*. (quoting *Rent-A-Center, West, Inc. v. Jackson*, 561

U.S. 63, 68-69 (2010)).  "Such an agreement, commonly known as a delegation clause, requires clear and unmistakable evidence that the parties agreed to have an arbitrator decide arbitrability."  *Id*. (internal quotation marks and citation omitted).  "A valid delegation clause precludes courts from resolving any threshold arbitrability disputes."  *Id*.  Indeed, as the Sixth Circuit recently explained, "[t]he practical effect of a delegation provision is that if arbitrability is challenged, then the arbitrator, not the court, must address the challenge.  The Sixth Circuit explains that such a challenge may come in the form of a coverage challenge or as an enforceability challenge.  *Becker v. Delek US Energy, Inc.*, 39 F.4th 351, 355 (6th Cir. 2022).  Regardless, the outcome is the same: "a valid delegation provision removes judicial purview and transfers the question of arbitrability to an arbitrator."  *Id.*

In this case, the arbitration clause includes a broadly worded delegation clause that requires the arbitrator to "decide any issues relating to the making, validity, enforcement, or scope of this arbitration agreement, arbitrability, defenses to arbitration including unconscionability, or the validity of the jury trial, class action or representative action waivers…"  (ECF No. 6-4, ¶ 15).  The Sixth Circuit found similar language to be "clear and unmistakable evidence requiring that an arbitrator shall decide the 'applicability, enforceability,' or validity of both

the arbitration provision and the entire contract." *In re StockX Customer Data Sec. Breach Litig.*, 19 F.4th 873, 879 (6th Cir. 2021) (The delegation clause at issue provided that "the arbitrator ... shall have exclusive authority to resolve any dispute arising out of or relating to the interpretation, applicability, enforceability or formation of [the] Agreement to Arbitrate, any part of it, or of the Terms including, ... any claim that all or any part of [the] Agreement to Arbitrate or the Terms is void or voidable."). But even where an agreement contains a so-called delegation provision, "before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists." *Id*. (quoting *Henry Schein, Inc. v. Archer & White Sales, Inc.*, ⸺ U.S. ⸺, 139 S. Ct. 524, 529 (2019) (citing 9 U.S.C. § 2)). The Supreme Court has instructed that "courts should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement *nor* (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue." *Id.* (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010)). Thus, the court must first resolve any challenge that pertains to the formation or existence of the contract containing the delegation provision. *Id*. at 880. If a contract exists, then the court must decide any remaining enforceability or validity challenge only if it would "affect

the [delegation provision] alone" or "the basis of [the] challenge [is] directed

specifically to the [delegation provision]."  *Id*. (quoting *Rent-A-Center*, 561 U.S. at

71-72).

Under Ohio law, the "[e]ssential elements of a contract include an offer,

acceptance, contractual capacity, consideration (the bargained for legal benefit

and/or detriment), a manifestation of mutual assent and legality of object and of

consideration."  *Kostelnick v. Helper*, 770 N.E.2d 58, 61 (Ohio 2002) (citation

omitted).  The manifestation of mutual assent is determined based on evidence of

the parties' actions, such as by making payments.  *See Advance Sign Grp., LLC v.

Optec Displays, Inc*., 722 F.3d 778 (6th Cir. 2013); *Tekfor, Inc. v. SMS Meer Serv.,

Inc.*, 2014 WL 5456525, at *7 (N.D. Ohio Oct. 27, 2014) (plaintiff accepted terms

of agreement and objectively demonstrated assent by having defendant go

forward with repair work, and by paying regular service rates stated in

defendant's acknowledgement and premium service rates contained in

defendant's terms and conditions for service).  Here, Plaintiffs do not seem to

directly challenge the *formation* of the contract, and do not address GoodLeap's

arguments that they manifested their assent through their actions, in addition to signing the agreement, by making payments.[1]

Instead, the focus of Plaintiffs' argument is that the arbitration clause is unenforceable because the contract is unconscionable and the result of fraud in the inducement.  (ECF No. 16, PageID.163).  The *StockX* decision is instructive.  "If the claim is fraud in the inducement *of the arbitration clause itself*—an issue which goes to the 'making' of the agreement to arbitrate—the federal court may proceed to adjudicate it."  *Id*. at 882-883 (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co*., 388 U.S. 395, 403-04 (1967) (emphasis added).  Otherwise, the FAA "does not permit the federal court to consider claims of fraud in the inducement of the contract generally."  *Id.*  In *Rent-A-Center*, the Court reasoned

---

[1] To the extent Plaintiffs make such a claim, it is without merit under *StockX*.  The court, applying Michigan law, concluded that the plaintiffs there did not rebut the defendant's evidence that they accepted the agreement.  *Id*. at 882.  It was the plaintiffs' obligation, under Michigan law, to read the contract and obtain an explanation if they did not understand it.  *Id*. the plaintiffs also did not offer any evidence that could lead a rational trier of fact to find that the contract did not exist; accordingly, there were no genuine issues of material fact as to whether the plaintiffs accepted the terms of the contract.  *Id*.  Similarly, under Ohio law, a "person of ordinary mind cannot be heard to say that he was misled into signing a paper which was different from what he intended, when he could have known the truth by merely looking when he signed."  *ABM Farms, Inc. v. Woods*, 692 N.E.2d 574, 579 (Ohio 1998) (quoting *McAdams v. McAdams*, 88 N.E. 542, 544 (Ohio 1909)).  A plaintiff has a duty to read the agreement that he initialed and signed and later confirmed with payment.  *Cook v. Home Depot U.S.A., Inc*., 2007 WL 710220, at *6 (S.D. Ohio Mar. 6, 2007).  Similarly here, Plaintiffs do not seriously dispute that they signed the agreement and operated under its terms.  Thus, they have not created any issue of fact regarding the existence of the agreement.

that an arbitrator must decide plaintiff's claim that the employment contract was "both procedurally and substantively unconscionable" because his challenges were not "specific to the delegation provision." *StockX*, 19 F.4th at 883 (quoting *Rent-A-Center*, 561 U.S. at 73).

In *StockX*, because the delegation provision required the arbitrator to decide "any claim that all or any part of th[e] Agreement to Arbitrate or the Terms is void or voidable," the court held that the plaintiffs must "specifically" attack the validity or enforceability of "the delegation provision" itself. *Id*. at 884 (citations omitted). Similarly here, the arbitration provision delegates questions of unconscionability as well as the making and validity of the contract to the arbitrator and thus, Plaintiffs must specifically attack the delegation provision itself. (ECF No. 6-4, ¶ 15) (The delegation clause requires the arbitrator to "decide any issues relating to the making, validity, enforcement, or scope of this arbitration agreement, arbitrability, defenses to arbitration including unconscionability, or the validity of the jury trial, class action or representative action waivers..."). Plaintiffs' unconscionability and fraud in the inducement arguments focus on whether the entire agreement is unconscionable or was fraudulently induced and they do not differentiate delegation clause from the rest

of the agreement.  In other words, all of Plaintiffs' factual assertions and legal

arguments apply equally to the entire agreement, not just the delegation clause.

*Hutzell v. Power Home Solar, LLC*, 2023 WL 4932068 (S.D. Ohio Aug. 2,

2023), is persuasive on the question of whether the Plaintiffs here have made a

sufficiently specific attack on the delegation provision.  In *Hutzell*, the plaintiffs

made nearly identical arguments to those made by Plaintiffs here regarding why a

similar loan agreement with GoodLeap and attendant arbitration and delegation

clause were not enforceable:

> (1) Plaintiffs' signatures and initials were affixed to the
> Loan Agreements using auto-filling software; (2)
> Plaintiffs were each given an inaccurate and rapid
> summary of the Loan Agreement (and did not read its
> provisions themselves); (3) Plaintiffs were never
> provided with an accurate explanation of the arbitration
> provision; (4) Plaintiffs were assured that the inaccurate
> characterizations of the loan provided to them by the
> representative were memorialized in the Loan
> Agreements; and (5) Plaintiffs were told that their ability
> to receive various rebates, credits, and discounts were
> conditioned on their immediate signature on their
> individual contracts. Plaintiffs also argue that the Loan
> Agreement's delegation clause assigning to arbitration
> the threshold matter of the arbitration clause's
> enforceability is void because Plaintiffs were
> fraudulently induced to sign the Agreement. Finally,
> Plaintiffs contend that the arbitration provision is
> substantively unconscionable because it requires
> GoodLeap to pay merely a portion of the arbitration
> fees; expressly prohibits Plaintiffs from being involved in
> class actions; requires arbitration by JAMS; and does not

require GoodLeap to arbitrate its claims against
Plaintiffs.

*Id*. at *9.  The court concluded in *Hutzell* that arbitration was proper because the
plaintiffs had failed to make a challenge specific to the delegation clause as
opposed to the entire loan agreement itself.  *Id*.  And because of the lack of a
specific challenge to the delegation provision, the question of whether the
arbitration agreement was enforceable was a question for the arbitrator to
decide.  *Id*. at *10.

Similarly here, Plaintiffs' fraud in the inducement and unconscionability
arguments apply to the entire sales agreement, not just the delegation clause.
(ECF No. 16, PageID.173-177).  Thus, under the teachings of *Rent-A-Center* and
*StockX*, the arbitrator must decide whether the contract was procedurally and
substantively unconscionable or induced by fraud, given that the challenges to
the agreement are "not specific to the delegation provision."  *StockX*, 19 F.4th at
883 (quoting *Rent-A-Center*, 561 U.S. at 73).  Accordingly, the motion to compel
arbitration and dismiss GoodLeap from this lawsuit is granted.  Because the
arbitrator must decide questions regarding unconscionability and fraud in the
inducement, Plaintiffs motion seeking discovery on this issue must also be denied
as moot.

**III.   WALLER'S MOTION TO DISMISS**

A.   <u>Standard of Review</u>

In deciding a motion to dismiss under Rule 12(b)(6), the court "must construe the complaint in the light most favorable to the [nonmoving party] ... [and] accept all well-pled factual allegations as true*." League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007); *see also Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 562 (6th Cir. 2003).  The complaint must provide "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'"  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  Moreover, the complaint must "contain[ ] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).

A complaint is subject to dismissal for failure to state a claim if the allegations, taken as true, show the plaintiff is not entitled to relief, such as "when an affirmative defense ... appears on its face." *Jones v. Bock*, 549 U.S. 199, 215 (2007) (quotation marks omitted).  A claim has "facial plausibility" when the nonmoving party pleads facts that "allow[ ] the court to draw the reasonable

inference that the [moving party] is liable for the misconduct alleged." *Id*. at 678.

However, a claim does not have "facial plausibility" when the "well-pleaded facts

do not permit the court to infer more than the mere possibility of misconduct."

*Id*. at 679.  The factual allegations "must do more than create speculation or

suspicion of a legally cognizable cause of action; they must show entitlement to

relief." *League of United Latin Am. Citizens*, 500 F.3d at 527.  Showing

entitlement to relief "requires more than labels and conclusions, and a formulaic

recitation of the elements of a cause of action will not do." *Ass'n of Cleveland Fire

Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007) (quoting *Twombly*,

550 U.S. at 555).

      B.   <u>Factual Background</u>

      On September 15, 2020, Plaintiffs entered into the Sale Agreement with

PHS for the purchase and installation of a 7.92 kW residential solar system (the

"Solar Installation").  (ECF No. 2-1).  The Sale Agreement was executed

contemporaneously with a written financing agreement between Plaintiffs and

GoodLeap LLC.  (ECF No. 2-2).  Pursuant to the loan agreement, Plaintiffs received

a loan to finance the $47,728.00 Solar Installation cost over a twenty-year term at

a 3.99% fixed interest rate.  *Id*.  Shortly after the Sale Agreement and the loan

agreement were executed, PHS installed the solar system at Plaintiffs' residence, which includes 24 Silfab solar panels and an inverter.  (ECF No. 2-1).

Plaintiffs seek to hold Waller personally liable for the alleged tortious conduct of PHS based on his position as PHS's CEO.  Plaintiffs allege that Waller was intimately involved in the day-to-day operations of his business, Pink Energy. (ECF No. 2-2, ¶¶ 23-26).  In fact, Waller admitted that he "did everything" at Pink Energy, which included developing and teaching deceptive and fraudulent sales techniques to the company's salesmen.  *Id*. at ¶ 28.  Part of Waller's sales training was to teach and encourage sales representatives to "engage in pressured hard-sell tactics, which included, but were not limited to, misleading customers to the efficiency and efficacy of the solar panels they sold, manipulating customers' concerns with what were referred to as 'pain points,' misrepresenting the Federal Solar Tax Credit as a tax rebate, and making false threats regarding the Federal Tax Credit in an attempt to make customers quickly sign a contract that they had no opportunity or ability to read."  *Id*. at ¶¶ 22-23; *see also*, ¶¶ 45-56.  Waller also taught salesmen deceptive tactics such as: (1) using an electronic device that only they could control for signing agreements; (2) not providing written contracts to customers; (3) not allowing customers to read the contract free of pressure; (4) providing inaccurate and false information regarding sales documents; (5)

misrepresenting a Federal tax credit as a rebate; (6) mischaracterizing and

exaggerating the capabilities of their systems; and (7) price gouging customers.

Plaintiffs' Amended Complaint alleges that Waller designed and taught these

fraudulent tactics, but it also alleges that Mr. Waller regularly reinforced the

tactics at sales meetings and personally used them on customers across the

country.  *Id*. at ¶¶ 23-26, 29, and 45.

    C.    <u>Analysis</u>

        *1.    Choice of Law*

Waller claims that Michigan substantive law applies here as the law of the

forum state.[2]  However, because this case was transferred from the Northern

District of Ohio, the court will apply the choice-of-law analysis that the transferor

court would have applied, in this case Ohio's.  *See Rosen v. Chrysler Corp*., 205

F.3d 918, 921 n.2 (6th Cir. 2000) ("When a case is transferred, the transferee

court must apply the choice of law rules that the transferor court would have

applied had the case not been transferred.").  Waller alleges that Michigan law

applies here, and he does not offer any analysis under the choice-of-law rules of

---

    [2] If this matter had originated in this District, the court would have applied Michigan's choice of law rules.  *See Klaxon v. Stentor Elec. Mfg. Co., Inc*., 313 U.S. 487, 496 (1941); *see also International Ins. Co. v. Stonewall Ins. Co*., 86 F.3d 601, 604 (6th Cir. 1996).

the State of Ohio.  Ohio courts apply the "most significant relationship" test of

§ 145 of the Restatement when resolving choice-of-law issues in tort actions.

*Scott Fetzer Co. v. Am. Home Assurance Co., Inc*., --- N.E.3d ----; 2023 WL 7170739

(Ohio Sup. Ct. Nov. 1, 2023).  These factors include (a) the place where the injury

occurred, (b) the place where the conduct causing the injury occurred, (c) the

domicil, residence, nationality, place of incorporation and place of business of the

parties, and (d) the place where the relationship, if any, between the parties is

centered.  Restatement (Second) of Conflict of Laws § 145.  Here, the alleged

injury occurred in Ohio, the plaintiffs are domiciled in Ohio, and the related

contract for sale has a provision stating that the interpretation and construction

of the Sales Agreement and "all matters related to this Agreement, shall be

governed by the laws of the State where the Project and Property are located."

(ECF No. 2-1, PageID.188).  Here, all signs point to Ohio law governing the dispute.

   2.    *Piercing the corporate veil/alter ego*

      Waller argues that the allegations against him are threadbare, based on

nothing more than speculative information and belief, and consist entirely of legal

conclusions.  He also argues that Plaintiffs fail to allege any facts that allow them

to hold Waller individually liable for the actions of PHS.  Notably, two decisions

from the Northern and Southern District of Ohio have dismissed identical claims

against Waller, finding the allegations insufficient under Ohio law to state a claim against him individually.  *See Mondello v. Power Home Solar, LLC*, 2023 WL 6311463 (N.D. Ohio Sept. 28, 2023) and *Hutzell v. Power Home Solar, LLC*, 2023 WL 4932068 (S.D. Ohio Aug. 2, 2023).[3]

The court's analysis in *Mondello* is instructive.  The court first summarized applicable Ohio law, which the court here will reiterate.  *Id.* at *6.  Under Ohio law, a corporate officer "will not be held liable for the debts or acts of the corporate entity," subject to two exceptions.  *State ex rel. DeWine v. Osborne Co*., 104 N.E.3d 843, 856–857 (Ohio Ct. App. 2018).  The first exception is where "upon piercing the corporate veil," it appears that "a corporation is simply the 'alter ego' of the individual sought to be held liable."  *Id*. (quoting *Mohme v. Deaton*, 2006 WL 3833923, at *1 (Ohio Ct. App. Dec. 28, 2006)).  The second, known as the "personal participation" theory, is that a corporate officer may be held personally liable for "tortious acts he or she has [personally] committed."  *Id*. at 857.

As to the first exception, under Ohio law:

> [T]he corporate form may be disregarded and individual
> shareholders held liable for corporate misdeeds when

---

[3] With the court's permission, Plaintiffs submitted supplemental authority from an Ohio state court, denying a motion to dismiss similar claims against Waller.  (ECF No. 44, *Cleveland v. Power Home Solar*, Case No. 2023-cv-00730, Court of Common Please, State of Ohio).  In this case, the court determined that the plaintiffs stated a claim against Waller, but did not address the alter ego doctrine.  Accordingly, the court does not find this decision persuasive.

> (1) control over the corporation by those to be held
> liable was so complete that the corporation has no
> separate mind, will, or existence of its own, (2) control
> over the corporation by those to be held liable was
> exercised in such a manner as to commit fraud or an
> illegal act against the person seeking to disregard the
> corporate entity, and (3) injury or unjust loss resulted to
> the plaintiff from such control and wrong.

*Belvedere Condo. Unit Owners' Ass'n v. R.E. Roark Cos., Inc*., 617 N.E.2d 1075,

1086 (Ohio 1993).  The first element is a restatement of the alter ego doctrine,

which requires that a plaintiff "show that the individual and the corporation are

fundamentally indistinguishable."  *Taylor Steel, Inc. v. Keeton*, 417 F.3d 598, 605

(6th Cir. 2005) (quoting *Belvedere*, 617 N.E.2d at 1086).  In determining whether

the company is an alter ego of the individual, Ohio courts consider such factors

as:

> (1) grossly inadequate capitalization, (2) failure to
> observe corporate formalities, (3) insolvency of the
> debtor corporation at the time the debt is incurred, (4)
> shareholders holding themselves out as personally liable
> for certain corporate obligations, (5) diversion of funds
> or other property of the company property for personal
> use, (6) absence of corporate records, and (7) the fact
> that the corporation was a mere facade for the
> operations of the dominant shareholder(s).

*Id*. (quoting *LeRoux's Billyle Supper Club v. Ma*, 602 N.E.2d 685, 689 (Ohio Ct. App.

1991)).  Alternatively, for the personal participation theory, a plaintiff need not

pierce the corporate veil to hold individuals personally liable for their tortious

acts. *Hutzell*, 2023 WL 4932068, at *6 (citing *DeWine*, 104 N.E.3d at 857).

However, a corporate officer "may not be held liable merely by virtue of his status

as a corporate officer." *Id*. (internal quotation marks omitted) (quoting *DeWine*,

104 N.E.3d at 857).

The *Mondello* court first rejected the alter ego doctrine because there was

no indication in the complaint that Waller exercised the requisite "domination

and control" over Pink Energy. *Id*. at *8 (citing *Belvedere*, 617 N.E.2d at 1086;

*Hutzell*, 2023 WL 4932068, at *7). The court found plaintiffs' allegation that

Waller "maintained hands-on control of the day-to-day activities of the business"

insufficient and found no allegations in the complaint suggesting that Waller

"exercised complete or near-complete dominion over the company to the extent

that it lacked any effective autonomy" or pertaining to any of the factors Ohio

courts consider when deciding whether the alter ego doctrine applies. *Id*.

(quoting *Hutzell*, 2023 WL 4932068, at *7; and citing *Taylor Steel*, 417 F.3d at

605). In sum, the court found no allegations that Pink Energy was

indistinguishable from Waller himself, so the complaint failed to provide a basis to

proceed under the alter ego doctrine. *Id*. The allegations in the instant complaint

are nearly identical to those found wanting in *Mondello* and *Hutzell*, and the court

agrees with the analysis in those cases. Indeed, there are virtually no allegations

in the FAC regarding the seven alter ego factors required under Ohio law as identified above.

The *Mondello* court also rejected the plaintiffs' claims under the personal participation theory because the complaint failed to allege that Waller engaged in any tortious conduct related to this case. *Id.* (citing *State ex rel. Yost v. Leonard*, 2021 WL 840973, at *3 (Ohio Ct. App. Mar. 3, 2021)). In *Mondello*, the court observed that while the allegations against Waller pertain to his level of influence over Pink Energy's day-to-day operations and tactics; none of them suggest that Waller interacted with the plaintiffs during the sale of the solar power system, or even that Waller directed the Pink Energy employee who made the sale to use those hard-sell sales tactics during his meeting with the plaintiffs. And the court found that any allegations of illicit sales techniques used at Waller's previous company were not relevant to the consideration of his personal involvement in this case. *Id.* The court agrees with the conclusion in *Hutzell* that "[e]ven if Defendant Waller routinely pushed for the company's sales representatives to engage in hard-sell tactics, Plaintiffs make no allegation that he pushed for them to sell the defective systems at issue in this case or even knew about the alleged misdeeds giving rise to their injuries." *Id.* (quoting *Hutzell*, 2023 WL 4932068, at *8 (internal quotation marks omitted)). The facts alleged here are not materially

different from those alleged in *Mondello* and *Hutzell* and thus, the claims against Waller must be dismissed.

Plaintiffs, however, claim that this court should find otherwise under *Onyx Env't Servs., LLC v. Maison*, 407 F. Supp. 2d 874 (N.D. Ohio 2005).  In *Onyx*, the plaintiff contracted with the defendant EPI to recycle household paint.  *Id*. at 876. EPI decided to store the collected paint instead of recycling it as the contract required.  *Id*.  To further this scheme, EPI, through an employee, sent "false [certificates of recycling] ("CORs") to induce [the plaintiff] to keep doing business with [the plaintiff]."  *Id*. at 877.  Once EPI shut down, the plaintiff discovered that the paint was not recycled and was later fined by the State of Ohio.  *Id*. at 876. The court observed that under Ohio law, an officer can be "liable for a tort committed by the corporation under his control, or with his participation or cooperation."  *Id.* at 879 (citing *Central Benefits Mut. Ins. Co. v. RIS Admin. Agency, Inc*., 93 Ohio App.3d 397, 403 (Ohio App. 1994) (citing *Young v. Featherstone Motors, Inc*., 97 Ohio App. 158, 171 (Ohio App. 1954)).  Tacit knowledge and approval is enough to create a jury question as to an officer's personal liability for a tort committed by a corporation.  *Id*.  However, *Onyx* is distinguishable because the officer controlled the day-to-day operations of the corporation *and* interacted with the wrongdoer daily.  In addition, the officer

owned the warehouse where the paint was stored.  Under these circumstances, the court concluded that a jury could find that the officer was personally liable for a tort committed by the corporation.  *Id*. at 879.  Here, however, there are no allegations in the FAC about daily contact between the employees who interacted with Plaintiffs and Waller or that Waller was personally involved in Plaintiffs' transaction in any way.  *Onyx* does not save Plaintiffs' claims against Waller.

In sum, Plaintiffs cannot overcome Ohio's rule that a corporate officer may not be held liable for the debts or acts of the corporate entity and the claims against Waller must be dismissed.[4]

## IV.    TRIVEST'S MOTION TO DISMISS

### A.    Standard of Review

Federal Rule of Civil Procedure 12(b)(2) allows a defendant to move for dismissal of a case for lack of personal jurisdiction.  When considering a motion under Rule 12(b)(2), the court may: (1) decide the motion upon the affidavits alone; (2) permit discovery in aid of deciding the motion; or (3) conduct an evidentiary hearing to resolve any apparent factual questions."  *Theunissen v. Matthews,* 935 F.2d 1454, 1458 (6th Cir. 1991).  Regardless of which method the

---

[4] Given the foregoing conclusions, Waller's other arguments in favor of dismissal need not be addressed.

court chooses, the plaintiff bears the burden of establishing that the court can exercise personal jurisdiction over the defendant. *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002). The weight of this burden, however, depends on whether the court decides to rule on the parties' written submissions alone or to hear evidence. *Id.* Where, as here, the court decides a motion without an evidentiary hearing, the plaintiff must make only a prima facie showing that personal jurisdiction exists to defeat dismissal. *Anwar v. Dow Chem. Co.*, 867 F.3d 841, 847 (6th Cir. 2017). This burden is "relatively slight." *Air Prod. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549 (6th Cir. 2007) (citing *Am. Greetings Corp. v. Cohn*, 839 F.2d 1164, 116 (6th Cir. 1988)). The pleadings and affidavits must be viewed in the light most favorable to the plaintiff, and the court should not weigh any contrary assertions offered by the defendant. *AlixPartners, LLP v. Brewington,* 133 F. Supp. 3d 947, 954 (E.D. Mich. 2015) (citing *Intera Corp. v. Henderson*, 428 F.3d 605, 614 (6th Cir. 2005)).

  B. <u>Analysis</u>

  Trivest asserts that the court has no personal jurisdiction over it. Michigan's "long-arm" statute extends "limited" jurisdiction over nonresident corporations pursuant to Mich. Comp. Laws § 600.715, and "general" jurisdiction pursuant to Mich. Comp. Laws § 600.711. Limited jurisdiction extends only to

claims arising from the defendant's activities that were either within Michigan or had an in-state effect. *Third Nat'l Bank in Nashville v. WEDGE Group Inc*., 882 F.2d 1087, 1089 (6th Cir. 1989). General jurisdiction, on the other hand, enables a court in Michigan to exercise jurisdiction over a corporation regardless of whether the claim at issue is related to its activities in the state or has an in-state effect. *Id*. Mich. Comp. Laws § 600.715 extends limited personal jurisdiction over a nonresident corporation in claims "arising out of the act or acts which create any of the following relationships," including: "[t]he transaction of any business within the state" under § 600.715(1), "[t]he doing or causing of any act to be done, or consequences to occur, in the state resulting in an action for tort" under § 600.715(2), and the "[e]ntering into a contract for services to be performed or for materials to be furnished in the state by the defendant" under § 600.715(5).

Trivest argues that there are no Michigan-related allegations in the complaint, (ECF No. 2, ¶¶ 1-228), and there are no factual allegations connecting Trivest to Michigan in any way. The complaint alleges that Trivest was "involved in the day-to-day operation of Pink Energy," ECF No. 2, ¶ 42, through North Carolina resident Defendant Waller, ¶ 7. But there is no allegation that Trivest interacted with any Michigan consumers. Further, Plaintiffs are Ohio residents with no connection to Michigan under these circumstances. *Id*. ¶ 1. Plaintiffs'

contention that a foreign entity that is a minority investor in another entity and generally participated in the business as a whole, but not any business specific to Michigan, does suggest purposeful availment.

In response, Plaintiffs do not contest the lack of personal jurisdiction and thus, any dispute on the merits has been waived.  *Notredan, L.L.C. v. Old Republic Exchange Facilitator Co.*, 531 F. App'x 567, 569 (6th Cir. July 29, 2013) (failure to respond to an argument that a claim is subject to dismissal "amounts to a forfeiture of [such] claim").  Instead, it argues that Trivest should be estopped from asserting a lack of personal jurisdiction because it moved to dismiss this case and a companion case in the Ohio district court based on the "first-to-file" rule. The Ohio district court then asked the parties in this case why the case should not be dismissed under the first-to-file rule.  The court held that the first-to-file rule did not apply, and *sua sponte* transferred this matter to this district pursuant to 28 U.S.C. § 1404(a).  (ECF No. 26-3).  The Ohio district court also suggested that this court would have personal jurisdiction over Defendants "because it appears that they had certain minimum contacts with the forum by operating their business and maintaining an office in the district."  (ECF No. 26-3, p. 10) (citing ECF No. 1, ¶¶ 16-19, *Hall v. Trivest*, EDMI Case No. 22-12743).  However, nothing in the complaint in *Hall v. Trivest* suggests any Defendant in that case, including

Trivest, operates their business in Michigan or has an office here. Plaintiffs argue that Trivest cannot seek dismissal based on lack of personal jurisdiction when it sought transfer to this court. However, a review of the docket shows that Trivest sought dismissal based on the first to file rule, not transfer. (Case No. 22-01277, ECF Nos. 43, 49, 50). Further, Plaintiffs cite no authority for this proposition. Plaintiffs also ask the court to transfer the claims against Trivest back to Ohio if it finds a lack of personal jurisdiction. However, Trivest also moved to dismiss that case for lack of personal jurisdiction and Plaintiffs have not made any showing that the Ohio district court has personal jurisdiction over Trivest.

Trivest has established that it does not have sufficient contacts under the Michigan long-arm statute and for purposes of satisfying due process. Additionally, Plaintiffs do not contest that this court lacks personal jurisdiction over Trivest. Thus, Trivest's motion to dismiss based on lack of personal jurisdiction is granted.[5]

## V. CONCLUSION

For the reasons set forth above, GoodLeap's motion to dismiss and compel arbitration is **GRANTED**, Plaintiffs' motion for limited discovery is **DENIED**,

---

[5] The court need not address the other grounds for dismissal cited by Trivest.

Waller's motion to dismiss is **GRANTED**, with prejudice, and Trivest's motion to

dismiss is **GRANTED**, without prejudice.

      **SO ORDERED**.

Date: March 30, 2024                     <u>s/F. Kay Behm</u>
                                         F. Kay Behm
                                         United States District Judge